## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHAEL CRAIG BANDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3102 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Michael Craig Bandy appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits). 42 U.S.C. §§ 416(i), 423, 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Bandy filed a Motion for Summary Reversal (d/e 15). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19). The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered May 16, 2019 (d/e 8). For the reasons set forth below, the Decision of the Commissioner is affirmed.

<u>STATEMENT OF FACTS</u>

On January 27, 2014, Bandy filed applications for Disability Benefits. He alleged that he became disabled on September 27, 2012.  Bandy was last insured for DIB on December 31, 2012 (Date Last Insured).  Bandy had filed a previous application for Disability Benefits on October 14, 2009. Bandy had claimed at that time that he became disabled on February 17, 2007.  The prior application was denied on September 26, 2012.  R. 13, 15, 82-100, 288, 302, 303, 579.

Bandy was born on November 4, 1982.  He graduated from high school.  Bandy was in a traffic accident in 2000 when he was 17 years old. After the accident, he had several surgeries on his knees, hips, and left shoulder.  Bandy suffered from left shoulder degenerative joint disease, mild glenohumeral degeneration status post surgeries, and total replacement; chondromalacia of the right knee status post arthroscopy; and degenerative joint disease of the left hip.  Bandy last worked in 2007.  His prior relevant work was a worker at a state agency duck station, a power washer operator at a hog processing facility, a groundskeeper at a state park, and a line operator at a manufacturing facility that made plastic kitchen storage bags.  R. 15, 22, 69, 288, 302, 303, 579.

On March 18, 2012, physician's assistant Jonnelle Smith PAC completed a questionnaire about Bandy's physical functional capabilities. The questionnaire was addressed to Bandy's primary care physician Dr. Michael McNear, M.D. PA Smith stated that she saw Bandy on May 19, 2011 and December 12, 2011 for left shoulder pain. PA Smith said that an MRI on December 12, 2011 showed a labral tear in Bandy's left shoulder. Smith opined that Bandy could sit at least six hours a day and stand/walk for at least six hours a day. Smith opined Bandy did not need to shift positions or move around during the workday and did not need to take unscheduled breaks during the workday. She opined that Bandy did not need an assistive device to walk. Smith opined that Bandy could frequently lift up to 20 pounds with both arms and up to 50 pounds with the right arm. Smith opined that Bandy could frequently twist, stoop, bend, crouch, climb ladders, climb stairs, handle objects, finger objects, and feel. Smith said that Bandy could reach in all directions with his right arm. Smith concluded, "Pt has a labral tear. Was referred to ortho for this. Once this is fixed, pt should be able to return to work fully." R. 378-79.

On July 13, 2012, Thomas E. Bilko, M.D. performed arthroscopic surgery on Bandy's left shoulder. Dr. Bilko debrided the torn labrum and partially torn rotator cuff in Bandy's left shoulder. R. 562-63.

On October 11, 2012, Bandy saw Dr. Bilko for a recheck of Bandy's left shoulder after surgery. Bandy reported that his shoulder was not improving. He said that he could not raise his arm above shoulder level and was still having "a lot of pain." Bandy asked for an increased dosage in his pain pills. Dr. Bilko noted that Bandy "stopped going to physical therapy but complained of increased pain." He elsewhere noted, "If his shoulder was hurting more why would he stop going to physical therapy?" Bandy stated that he stopped going to physical therapy because of money constraints. On examination, Bandy's left shoulder was tender on palpation of the supraspinatus muscles and had abnormal motion. Dr. Bilko assessed a sprained left superior glenoid labrum lesion and rotator cuff tendonitis—left impingement syndrome. Dr. Bilko discussed orthopedic options and prescribed home exercises. R. 472-74.

On November 4, 2012, Bandy saw Dr. Bilko for pain in his left shoulder and increased pain when raising both arms above shoulder level. Dr. Bilko noted that Bandy claimed pain with motion of his shoulder and also that the shoulder was catching. Bandy said he had generalized tenderness in his shoulder. Dr. Bilko referred Bandy to the orthopedic department at the Washington University School of Medicine in St. Louis

and pain specialists at the Piasa Pain Center. Dr. Bilko made the referral because he could not offer any other treatment to Bandy. R. 382.

On January 23, 2013, Bandy saw his primary care physician Dr. McNear for shoulder pain. Bandy said that his other doctor told him that there was nothing he could do for him. Bandy asked for a referral to Dr. Randall Rogalsky, M.D. Dr. Rogalsky performed surgery on Bandy in 2010 or 2011.[1] Bandy told Dr. McNear that he wanted to see Dr. Rogalsky again rather than go to St. Louis. He told Dr. McNear that he did not want to drive to St. Louis. Bandy reported that his left arm felt numb. He said he had pain in his left index finger. Bandy said that Tramadol and hydrocodone caused him to be sleepy. He did not want to take these medications because he was taking care of his 3-year-old child. Dr. McNear had difficulty examining Bandy's shoulder due to pain but observed limited range of motion in the left shoulder. Dr. McNear saw no edema or erythema in the left shoulder or left hand. Dr. McNear referred Bandy to Dr. Rogalsky. R. 435-37.

On January 28, 2013, Bandy saw Dr. Rogalsky. Bandy reported pain in his left shoulder and index finger. On examination, Bandy had

---

[1] Dr. McNear noted that the surgery was in 2011. R. 435. Dr. Rogalsky's notes indicate the surgery was in 2010. R. 409.

tenderness with a painful arc but no loss of glenohumeral rhythm. Provocative tests were normal. Bandy's left index finger was tender with mild popping. Dr. Rogalsky diagnosed recurrent left subacromial impingement with possible labral tear and left finger tendonitis. R. 409. Dr. Rogalsky ordered an MRI and x-ray of Bandy's left shoulder.

On January 29, 2013, Bandy had an MRI and x-ray of his left shoulder. The x-ray showed no fracture, post-operative changes in the inferior joint with a large orthopedic staple, and inferior humeral head osteophyte noted. R. 417. The MRI showed the same staple. The MRI showed that the visualized rotator cuff was intact, but a recurrent tear in the rotator cuff could not be excluded. The MRI showed minimal tendinopathy or strain in the supraspinatus tendon, moderate AC joint hypertrophy with minimal impingement of rotator cuff, and moderate to severe generalized degenerative changes in the shoulder with loss of surfaces and inferior humeral head osteophyte. R. 416.

On February 1, 2013, Bandy saw Dr. Rogalsky. Bandy reported increasing shoulder pain with some swelling. Bandy said he could not reach above his head. On examination, Bandy had positive provocative tests for impingement, and had a painful arc with loss of glenohumeral

rhythm at 70-degrees obduction.  Dr. Rogalsky recommended surgery.
Bandy agreed to the surgery.  R. 408.

On August 7, 2013, Dr. Rogalsky performed the left shoulder
acromioclavicular resection and rotator cuff repair.  R. 414-15, 425.

On September 6, 2013, Bandy saw Dr. Rogalsky for a one-month
post-operative follow up exam.  Bandy reported that he was "doing
adequately in physical therapy."  Bandy said he had some muscle spasms
and fluid collection that came and went with activity.  On examination,
Bandy had full range of motion and provocative tests were negative.  Dr.
Rogalsky saw no complications.  Dr. Rogalsky noted some numbness and
tingling.  Dr. Rogalsky diagnosed status post shoulder surgery with
"adequate results presently responsive to physical therapy."  Dr. Rogalsky
prescribed continued physical therapy.  R. 400-01.

On September 27, 2013, Bandy completed twenty sessions of
physical therapy.  Bandy reported that he used his left upper extremity with
his activities of daily living.  Bandy stated that he could not recall any
activity that he was unable to do.  Bandy said he still had a bump on the
posterior upper arm and popping in the anterior shoulder and
acromioclavicular joint.  Bandy said the popping was not painful.  Bandy
complained of pain with external rotation of his shoulder, but not with any

other movement.  His left upper extremity strength was 4+/5 for abduction, and otherwise 5/5 for other movements.  Bandy was to continue home exercises and see Dr. Rogalsky on October 4, 2013.  R. 421-22.

On February 27, 2014, Bandy saw PA Jonnelle Smith for left shoulder pain.  Bandy reported that the pain began a month earlier and was getting worse.  Bandy said his hand turned colors.  He asked for a referral to Dr. Rogalsky.  He contacted Dr. Rogalsky's office and they told him he needed a referral.  Bandy denied any injury to the shoulder.  He said he experienced some numbness and tingling.  He said that he had decreased range of motion.  He was taking Vicodin that was left over from Dr. Rogalsky.  On examination, Bandy had tenderness in his left AC joint and decreased range of motion secondary to pain.  Bandy's gait and stance were normal.  PA Smith ordered x-rays of the left shoulder and prescribed Norco for pain.  The x-ray showed no acute abnormality, mild glenohumeral degeneration, and postsurgical appearance of the glenoid.  Smith referred Bandy to Dr. Rogalsky.  R. 386, 450-52.

On March 17, 2014, Bandy saw Dr. Rogalsky again for pain in his left shoulder.  Bandy said that early in the previous winter, he felt a sharp pain in his left shoulder when he picked up a 4 to 5-inch diameter piece of firewood at home.  Bandy reported that the pain has been getting worse

over time.  Bandy had no other problems after the surgery.  On examination, Bandy had shoulder tenderness and painful arc with loss of glenohumeral rhythm at 70 degrees.  Provocative tests were positive for impingement.  Bandy's overall range of motion in his left shoulder was 25-30% limited.  Dr. Rogalsky reviewed a prior x-ray of the shoulder and noted that the staple could have migrated slightly causing the pain.  Dr. Rogalsky ordered an MRI.  R. 394-95.  The MRI showed a thickened supraspinatus tendon suggesting degenerative changes and a bone bruise on the humeral head.  R. 411.

On June 2, 2014, Bandy's father William Bandy completed a Function Report—Adult—Third Party form.  R. 295-302.  William Bandy said Bandy lived with him.  William Bandy said Bandy had reduced strength and chronic pain in his shoulder and knees.  William Bandy said that Bandy engaged "normal daily activities and care for dependent 4-year-old son." He said Bandy also fed and cared for their pets or other animals.  William Bandy said that Bandy's pain sometimes interfered with his sleep.   William Bandy said that Bandy had no problem taking care of his own personal care.  R. 295-96.

William Bandy said Bandy made sandwiches and complete meals on a daily basis.  William Bandy said Bandy took a normal amount of time to

prepare meals, and also, that Bandy's cooking habits did not change due to his problems with his shoulder, knees, and hips. William Bandy said Bandy did household cleaning, laundry, mowing, and minor household repairs. William Bandy said that Bandy took a normal amount of time to do these chores unless his pain level increased; Bandy then took breaks. William Bandy said that Bandy needed help lifting and moving items when his pain increased. William Bandy stated that Bandy shopped at least once a week and took a normal amount of time shopping. R. 296-97.

William Bandy said Bandy's hobbies were watching television, hunting, fishing, gardening, and camping. William Bandy indicated Bandy did these activities in season. He said that Bandy's hunting, fishing, and gardening was limited when his pain increased. William Bandy noted that Bandy socialized daily on Facebook as well as in public and at home. He said Bandy took Bandy's four-year old son to school, a campground, and William Bandy's farm. R. 298-99.

William Bandy said Bandy's impairments limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use his hands.[2] William Bandy stated that lifting 20 pounds increased Bandy's pain. He

---

[2] William Bandy also states here that Bandy had a hearing problem. Bandy mentions a hearing problem elsewhere in the record. See e.g., R. 323. The ALJ and the parties do not mention hearing impairments and do not cite to any medical evidence of any hearing impairment.

also said that Bandy's pain increased with walking, standing, reaching, or

bending.  William Bandy opined that Bandy could walk 400 to 800 yards

before he had to rest a few minutes.  R. 300.  William Bandy did not

indicate that Bandy used a cane.  R. 301.  William Bandy concluded:

> His shoulder has been repaired a number of times and knees
> are needing replacement.  He has had a busted ear drum and
> had numerous plugs as a child. Scarring has decreased
> hearing.  Shoulder keeps getting spurs.  He was in a car
> accident at 17 and injuries started problems and with age keeps
> getting worse.

R. 302.

On or about June 11, 2014, Bandy completed a Function Report—

Adult form.[3]  R. 309-15.  Bandy said he lived in a house with his family.

Bandy stated that he cared for his son.  He also watered and fed their pets

or other animals.  His son and brother helped care for the animals.  Bandy

said he had trouble putting on shirts because of his shoulder but had no

other problems with his personal care.  Bandy indicated he needed

reminders to take care of his personal care because he was forgetful. R.

309-11.

Bandy said that he cooked three meals a day.  He noted that cooking

took "2 or 3 hrs or more."  Bandy said he performed household cleaning

---

[3] The form is undated but appears to have been filed with his father's Function Report -Adult-Third Party form, R. 295-302, dated June 2, 2014, and Bandy's Work History Report form, R. 303-08, dated June 11, 2014.  These other two forms are both dated June 11, 2014.

and mowing.  Mowing and cleaning took all day.  He said he worked at it until he had to stop.  He rested for three to five hours and then resumed. Bandy said that his legs and arms went numb when he did cleaning and mowing.  Bandy went out daily with his son.  He shopped twice a month for two hours at a time.  He talked to friends and family in person or on the computer.  He stayed home most of the time.  R. 311-13.

Bandy said that his problems with his shoulder, knee, and hips limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and use his hands.  He said he could walk for five to 10 minutes before he had to rest. Bandy said he used a cane to walk when he was in large groups or when he was in a store walking.  R. 314-15.

On or about July 11, 2014, Bandy completed another Function Report—Adult form.  R. 316-25.[4]  Bandy said he spent his day fixing meals for his son, resting, and taking ibuprofen.  He took care of his son with help from his family.  He and his son took care of his son's pets.  Bandy said he cannot sleep with his pain.  He stayed awake until 2:00 or 3:00 a.m. because of the pain, and then got up at 7:00 a.m.  He had no problems with his personal care.  R. 315.

---

[4] Bandy dated this form on his birthday, November 4, 1982. R. 325.  The form, however, includes a fax information header showing that Bandy's law firm faxed the form on July 11, 2014.

Bandy said he cooked frozen pizza and also cooked on his grill. He had to prepare three or four hours to cook meals. Bandy did household cleaning and mowing. Cleaning took more than a week. He said mowing that should have taken two hours took him four hours or more. Bandy went out daily. He went shopping once or twice a week for at least two to three hours at a time. He watched television during the day. He spent time with family talking on the phone or sitting around a campfire. He socialized with family every two weeks. He regularly used a camper. He said he used to go to church, but now he could not sit that long. R. 316-23.

Bandy said that his problems with his shoulder, knees, and hips limited his ability to lift, squat, bend, stand, reach, walk, sit kneel, and climb stairs. He said that he could walk for four or five minutes before he had to stop and rest. He said he used a cane to "walk a long ways." The cane was prescribed in 2005. R. 323-24.

On August 18, 2014, Bandy saw state agency physician Dr. Joseph J. Kozma, M.D., for a consultative physical examination. R. 579-83. Bandy reported that he last worked in 2007. He reported that he had a blackout spell while working. He has not had any blackout spells since he quit working. Bandy rated his pain in his shoulders and low back as a 10 out of 10 at the time of the examination. Dr. Kozma noted, "There was no change

in his body language and facial expression while he claimed to have pain of 10 intensity."  Bandy reported that he was in a car accident in 2000 and had surgery on his left leg.  He reported that he could walk about 20 minutes at a time with a cane but then needs to sit down and rest.  Bandy said that he had no feeling from his knees down in both lower extremities. Bandy also complained of bilateral elbow pain.  Dr. Kozma noted that Bandy seemed have a lack of complete extension of his arms by approximately two degrees bilaterally.  Bandy said that he only took over-the-counter ibuprofen up to 3000 mg a day.  Bandy reported left shoulder surgery three times since 2011, left knee surgery in 2007 and 2008, two surgeries on the right knee of unknown date, left hip surgery in 2007, and ear surgery in 2000.  R. 579-80, 583.

On examination, Bandy was 71 inches tall and weighed 219 pounds. Bandy had normal muscle mass and strength in his upper extremities. Bandy had satisfactory range of motion in his back and decreased range of motion in his knees and hips.  Bandy's finger dexterity was normal, and his grip strength was 5/5 bilaterally.  Dr. Kozma said Bandy had no swelling, no tenderness, and no crepitus in any of his lower extremity joints.  Bandy had some tenderness in his upper lumbar spine.  Bandy's reflexes were 1+ in

upper extremities and absent in the lower extremities. Dr. Kozma's sensory examination was normal. R. 581-83.

Dr. Kozma's functional examination showed that Bandy could heel and toe walk with his cane. Bandy could squat halfway. He could bend over with his legs straight and reach his mid legs. Straight leg testing was 50 degrees on the right and 45 degrees on the left. Bandy used a cane to walk but did not put a great deal of weight on it. Bandy's initiation of walking and length of stride were normal. Bandy's posture was normal with no instability and his turning was normal. Dr. Kozma concluded that Bandy had no difficulty using his hands and fingers for fine and gross manipulations. Dr. Kozma's impression was chronic pain syndrome, decreased range of motion in both knees and hips, and possible peripheral neuropathy in lower extremities. R. 582-83.

On August 20, 2014, state agency physician Dr. Lenore Gonzalez, M.D., prepared a physical residual functional assessment of Bandy. Dr. Gonzalez opined that Bandy could: occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday and sit six hours in an eight-hour workday; occasionally climb ramps and stairs; and frequently crouch and crawl. Dr. Gonzalez opined that Bandy had no other physical functional limitations. R. 131-32.

On February 3, 2015, Bandy saw Advanced Practice Nurse Deborah Seymour, ANP-BC, in Dr. McNear's office. Bandy complained of left shoulder pain and left hip pain. Bandy said he felt popping in his left shoulder a few months earlier when he lifted a piece of firewood. Bandy reported difficulty raising his left arm and tingling in his fingers. Bandy said his chronic hip pain had worsened recently. Bandy reported that he was told he might need additional hip surgery. On examination, Bandy had pain on palpation of his left shoulder. Bandy elevated his left arm up to 80 degrees, with reduced flexion and extension. Bandy's arm had a tender soft tissue mass on it. Bandy's hips were tender to palpation. Bandy's initial gait was antalgic but improved as he continued walking. His gait and stance were slightly antalgic to the left. R. 599. X-rays of the left hips showed no acute osseous abnormality, signs of postoperative changes including 2 screws, and degenerative joint disease at joint spaces with osteophyte formation. R. 606. X-rays of the left shoulder showed no acute osseous abnormality, postoperative changes, mild degenerative joint disease with osteophyte formation and joint space narrowing, and a subchondral cyst suggested at the glenoid. APN Seymour assessed arthralgia of left shoulder and hip. She referred Bandy to Dr. Rogalsky. R. 599.

On February 19, 2015, Bandy saw Dr. Rogalsky. Bandy reported increased left hip pain with rotation radiating to his knee and aching pain at rest. He reported that his hip nearly gave way on several occasions. Bandy said he had difficulty reaching above his head with his left arm. He also had some left shoulder pain at rest. Bandy said he tried ibuprofen, but it upset his stomach. He said a steroid Dosepak helped. On examination, Bandy's range of motion with his left hip was 25% limited. He had a mild antalgic gait. He had no bony tenderness in his hip. Bandy's left shoulder had 80% of normal motion, a painful arc and a loss of glenohumeral rhythm at 80 degrees. Provocative tests for possible rotator cuff tear were negative. X-rays showed postoperative changes but were otherwise nondiagnostic. Dr. Rogalsky ordered an MRI of the left shoulder. Dr. Rogalsky prescribed Tylenol with codeine. R. 648-49, 680-81. The parties and the Administrative Law Judge (ALJ) do not cite any record that Bandy had the MRI of his shoulder at this time.

On March 4, 2015, state agency physician Dr. Reynaldo Gotanco, M.D., prepared a physical residual functional assessment of Bandy. Dr. Gotanco opined that Bandy could: occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday and sit six hours in an eight-hour workday; occasionally climb

ramps and stairs; and frequently crouch and crawl. Dr. Gotanco opined that Bandy had no other physical functional limitations. R. 145-46.

On March 18, 2016, Bandy had an MRI of his right knee. Bandy said he injured the knee twisting it. He reported medial pain, popping, and grinding. The MRI showed meniscus tears, a large knee joint effusion, moderate chondromalacia, and a small to moderate Baker's cyst. R. 683.

On March 28, 2016, Bandy saw Dr. Rogalsky for a follow up on the right knee MRI. Dr. Rogalsky diagnosed an internal derangement of the right knee. Dr. Rogalsky recommended arthroscopic surgery. R. 651.

On April 5, 2016, Dr. Rogalsky performed arthroscopic surgery on Bandy's right knee. The post-operative diagnosis was torn right meniscus/medial chondromalacia. R. 639, 653.

On April 15, 2016, Bandy saw Dr. Rogalsky for a follow up examination. Dr. Rogalsky found excellent results from the surgery. Bandy said he did not need physical therapy. He said that he has had occasional near giving way with stair climbing but otherwise was back to his normal activities. Dr. Rogalsky recommended range of motion and strengthening exercises and also prescribed oxycodone (Percocet). Dr. Rogalsky directed Bandy to return as needed. R. 654-56.

On September 11, 2015, Bandy completed a Function Report—Adult form.  R. 344-52. Bandy said that he lived with his family.  Bandy said that he could not lift very much; he could not kneel down and get up without help; and he could not sit long or his knee, shoulder, and back hurt.  He said that he could hardly sit on the floor and play with his son.  He hurt all the time.  The pain was sometimes so bad that he started shaking.  He said that he could not lift a gallon of milk with his left arm without experiencing a sharp shooting pain from his arm to his neck.  R. 344, 346.

Bandy said that in a normal day he got up, got his son off to the school bus, took his meds and lay down to watch television.  At 2:15 p.m., he picked up his son, brought his son home to do schoolwork, then he rested.  He cooked supper and put his son to bed, took his meds and went to bed for the night.  He said he took care of his five-year old son with the help of his family.  He fed and watered the dogs with his son's help.  He said that he only got four to six hours a sleep a night because of his pain.  He said he had trouble putting on shirts, but otherwise took care of his personal care.  R. 345.

Bandy said that he cooked every other day.  He used a crockpot to cook meals.  He took two to three hours to prepare meals.  He said that chopping and cutting "kill" his shoulder and his back.  Bandy said that he

did a little housework and a little mowing.  It took him a week to do a six-hour project.  Bandy said that if he pushed himself, he would be down for two to three days.  Bandy shopped for one to two hours at a time.  R. 347-48.

Bandy said that his hobbies were coon hunting, fishing, and watching television.  He watched others coon hunt from the truck now.  He could not fish very long because of his pain.  Bandy said he spent time with his family in the house.  He regularly took his son to school and back.  R. 349.

Bandy said his problems with his shoulder, hips, and knees limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use his hands.   He could only walk for two to three minutes before he had to rest for five to 10 minutes.  He said that he used a cane every day since 2000.  R. 351.

On August 12, 2016, Bandy saw Dr. Rogalsky for left shoulder pain and right knee pain.  Bandy said he had been on Norco for the pain since August 1, 2016.  Bandy reported right knee pain with popping, grinding, and giving way; and left shoulder pain with abduction and forward flexion.  On examination, Bandy's right knee was tender with palpation with positive McMurray's and Apley's grind tests.  The Lahman, pivot, shift, and drawer tests were negative.  Bandy's range of motion was 80% of normal.  Bandy's

left shoulder had modest tenderness and a painful arc with loss of glenohumeral rhythm at 70 degrees abduction. Provocative tests were positive for subacromial impingement. The drop arm test was positive. Dr. Rogalsky diagnosed recurrent derangement of the right knee and recurrent left shoulder pain secondary to rotator cuff tear. Dr. Rogalsky ordered MRIs of the left shoulder and right knee. R. 657-58.

On August 24, 2016, Bandy saw Dr. Rogalsky for a follow up after the right knee and left shoulder MRIs. Dr. Rogalsky diagnosed end stage posttraumatic arthropathy of the left shoulder with rotator cuff tear of the left shoulder, and no recurrent internal derangement of the right knee. Dr. Rogalsky prescribed Medrol Dosepak and oxycodone for the shoulder. Dr. Rogalsky recommended considering physical therapy for the knee. Dr. Rogalsky stated that Bandy had indications for a reverse total shoulder replacement surgery. R. 659-60.

On September 14, 2016, Bandy saw Dr. Rogalsky. Bandy said that his right knee "was doing adequately." Bandy said that his left shoulder responded well to the Medrol Dosepak. He indicated his symptoms had returned partially but he "was still doing everything he needs to do." Dr. Rogalsky diagnosed end stage posttraumatic arthropathy left glenohumeral

joint.  Dr. Rogalsky recommended, and Bandy agreed, to go forward with the reverse shoulder replacement surgery.  R. 661-62.

On January 31, 2017, Dr. Rogalsky performed a reverse left shoulder replacement surgery on Bandy.  R. R. 643-46, 663.

On February 10, 2017, Bandy saw Dr. Rogalsky for a follow up.  Dr. Rogalsky saw no complications from the surgery.  Bandy's range of motion was 40% of normal and his strength was 4/5.  X-rays showed excellent position of the prosthetic components.  Dr. Rogalsky noted inferior positioning of the entire shoulder due to muscle laxity.  Dr. Rogalsky said that "this will respond nicely to physical therapy."  Dr. Rogalsky prescribed physical therapy three times a week.  R. 664-665.

On February 13, 2017, Bandy saw a physical therapist for evaluation. Bandy reported pain with movement.  He said he was trying not to take the pain medication because it was addictive.  He was taking ibuprofen.  The physical therapist told him to talk to Dr. Rogalsky about his medications. The physical therapist scheduled Bandy for physical therapy three times a week for 10 weeks.  R. 686.

On February 27, 2016, Bandy stopped physical therapy after two weeks.  Bandy said that he had swelling in his left hand and wrist throughout the day.  Bandy said he felt tight in his shoulder area.  Bandy

was using heat to decrease his symptoms.  He was still having pain from his left shoulder to his elbow.  Bandy said he was no longer taking any pain medication.  The physical therapist applied electrical stimulation to the left shoulder for 15 minutes to decrease pain and inflammation.  Bandy performed his physical therapy exercise.  R. 689.

## THE EVIDENTIARY HEARING

On April 6, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 34-63.  Bandy appeared in person and with his attorney.  Vocational expert Mary Kathleen Shaworker also appeared.  R. 36.

Bandy testified first.  Bandy said he was right-handed.  His left shoulder replacement was the most significant orthopedic problem he had.  Bandy indicated he had three other surgeries on his shoulder before the replacement surgery.  He had 50 percent usage of his left arm before the replacement surgery and 10 percent usage at the time of the hearing.  He could reach overhead and extend his left arm straight out before the replacement surgery, but not at the time of the hearing.  R. 43-44.

Bandy stated that he did not know whether he would get full use of the shoulder after he fully recovered from the replacement surgery.  He said:

A   They're scratching their head right now. They – they just – they don't understand why. He said 90 percent of the other people are already raising their arm over their head, but I can't. I can't get it that – it hurts all the time. Whenever I walk now it pops. It's not supposed to.

R. 45.

Bandy said he had constant pain in his shoulder before the replacement surgery.  The pain was an 8 out of 10 usually.  The pain increased to 10 out of 10 if he did household chores such as washing dishes.  Bandy testified that after the replacement surgery he still was in constant pain.  R. 44-45.

Bandy then testified that his right knee was his second most serious impairment.  Bandy said he had "seven tears" in his knee in 2012.  He indicated they repaired those tears and a month later the tears were back.  He said that "the same tears keep coming back."  He stated that he had a total of five or six surgeries on the right knee.  He said that the doctor told him the only solution was knee replacement surgery.  Bandy rated his knee pain at the hearing as "Above a 10," on a scale of 0 to 10.  He said activities such as walking, sitting, and standing increase his knee pain.  He had no feeling in his right leg from the knee down. R. 44-46.

Bandy also testified that he had pain in his left knee and left hip.  He rated the pain in his left knee and hip at a 9 on a scale of 0  to 10.  He said

he could not lay down on his left side.  He quoted a health care provider's statement about his left leg, "I still got two screws in there.  He said one of these days I'll be walking, and my leg will snap."  R. 46-47.

Bandy testified that he could sit for 15 to 20 minutes before he had to change positions and stand in one position for 15 to 20 minutes.  R. 47-48.  Bandy said he could walk with a cane for about a block with the cane, but he would need to rest for five to 10 minutes after that.  R. 48-49.

Bandy said he always used a cane to stand or walk.  He said the cane was prescribed for him.  He started using a cane off and on whenever he had surgeries.  R. 51.  He used the cane constantly now because his right knee "pops and carries on," and because of his shoulder replacement surgery:

> I'm afraid if I don't have the cane that either my knee's going to give out because it has before.  I don't want to reach out to grab something to catch myself and then mess my shoulder up even more, so I use it for safety.

R. 48.

Bandy testified that he was on a two to five-pound weight-lifting limit with either arm.  He said he was on the limit for both arms because lifting with the right arm affected the left shoulder replacement surgery.  Bandy said that during physical therapy he could barely lift three pounds with his left arm.  Bandy opined that in an eight-hour workday, he might be able to

stand for a total of one hour and sit for a total of 10 to 30 minutes. R. 49-50.

Bandy said that he also suffered from blackout spells. He had blackout spells about once a month. He did not know what happened during a blackout spell. He would wake up when it was over and be fine. He said he has undergone tests, but the doctors could not determine a cause. He said he has been having the blackout spells for once a month since he left his last employment in 2007. He told his doctors about the spells. R. 51.

During his testimony, Bandy said, "I probably had over about 100 – pretty close to 100 surgeries so far and not done." He said that he had the 100 surgeries since the accident in 2000. Bandy initially said he "had no clue" how many of the surgeries occurred since 2012. He then said, "It's been about — a little over 50 times probably so far," since 2012. R. 52. Bandy's attorney said he did not know whether Bandy had 50 surgeries since 2012, but there were "multiple, multiple surgeries." R. 53.

Vocational expert Shaworker then testified. Bandy's attorney stipulated to Shaworker's qualifications as an expert. Shaworker reviewed Bandy's work history and determined the appropriate classifications for Bandy's jobs under the Department of Labor's Dictionary of Occupational

Titles (DOT).  Bandy explained that when he worked the state duck station, he checked the ducks that each hunter killed.  Shaworker opined that the job was equivalent to the DOT classification of a creel clerk.  The creel clerk checked fish caught by fishermen.  Shaworker opined, based on the DOT and Bandy's description of his duties, that the two jobs were equivalent.  R. 57-58.

The ALJ then asked Shaworker the following hypothetical question:

> I would ask you to assume a hypothetical individual of the Claimant's age, education and work history who's capable of work at a light exertional level but with certain limitations.  The individual should never climb ladders, ropes or scaffolds or be exposed to unprotected heights or hazardous work environments.  The individual can occasionally climb stairs or ramps; occasionally balance, stoop, kneel, crouch – excuse me. Let me take balance out of there.  I'm going to qualify that differently.  Occasionally stoop, kneel, crouch but never crawl; can frequently balance but will use a cane to ambulate more than 10 feet and can frequently lift overhead with either upper extremity; can frequently reach in all directions; can frequently engage in tasks that require fingering or handling.
> . . . .
>     Can he (sic) hypothetical individual perform the past work as creel clerk?

R. 58.  Shaworker opined that such a person could perform Bandy's prior work as a creel clerk, both as the job is generally performed and as Bandy actually performed it.  R. 58-59.

Shaworker also opined that such a person could perform other jobs, including information clerk, with 18,000 such jobs in the national economy;

toll collector, with 15,000 such jobs in the national economy; document preparer with 32,000 such jobs in the national economy; addresser with 8,000 such jobs in the national economy.  R. 59-60.

Shaworker opined that the person could not work if he missed two or more days a month from work or if he had to take frequent extra breaks beyond the normal breaks allowed at the jobs.  R. 61.  The hearing then ended.

## THE DECISION OF THE ALJ

The ALJ entered her decision on May 10, 2017.  R. 13-24.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ further noted that Bandy's Date Last Insured was December 31, 2012.  Bandy, therefore, had to be disabled before that date to be entitled to DIB.  R. 13.  See 42 U.S.C. § 423; Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011).  For purposes of Bandy's SSI application, he had

to show that he was disabled after the date he filed his application January 27, 2014.  He could not receive SSI benefits for any month before he filed his application.  See 20 C.F.R. § 416.335; Perkins v. Chater, 107 F.3d 1290, 1295 (7th Cir. 1997).

The ALJ found that Bandy met his burden at Steps 1 and 2.  Bandy had not engaged in substantial gainful activity since September 27, 2012, and he suffered from the impairments of left shoulder degenerative joint disease and mild glenohumeral degeneration status post surgeries and total replacement, chondromalacia of the right knee status post arthroscopy, and degenerative joint disease of the left hip.  R. 15.  The ALJ found at Step 3 that Bandy's impairments or combination of impairments did not meet or medically equal a Listing.  R. 16-17.

At Step 4, the ALJ found that Bandy had the following RFC:

After careful consideration of the entire record, the undersigned finds that  the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations. The claimant can never climb ladders, ropes, or scaffolds or be exposed to unprotected heights or hazardous work environments. He can occasionally climb ramps or stairs, stoop, kneel, or crouch. He can never crawl. He can frequently balance but will use a cane to ambulate more than ten feet. He can frequently lift overhead with the left upper extremity and can frequently reach in all directions.

R. 17.  In making this determination, the ALJ relied on: (1) Dr. Kozma's examination that found normal strength in his upper and lower extremities, normal sensation, and normal finger dexterity and grip strength; (2) the February 2015 examination that found range of motion at 80 percent of normal and x-rays that showed mild degenerative changes in the shoulder; (3) the September 2013 examination post right knee arthroscopy that showed full range of motion in the knee; (4) the August 2016 examination that showed chondromalacia of the right knee but no derangement or tear; (5) the fact that Bandy had his left shoulder replaced and the post-operative examination showed no complications and 10 days after the surgery Bandy stopped using his shoulder sling and stopped taking his pain medication; (6) the opinions of Drs. Gotanco and Gonzalez; the (7) the opinion of PA Smith; (7) Bandy's Function Report—Adult forms indicating that he engaged in several household activities including cleaning, laundry, mowing, and making minor repairs; and (8) William Bandy's Function Report—Adult—Third Party report that corroborated Bandy's report of his level of activity.  R. 17-20.

The ALJ considered Bandy's testimony only to the extent that the testimony was consistent with the medical and other evidence presented. The ALJ found that much of Bandy's testimony was not consistent with the

medical evidence and other evidence. The ALJ noted that Bandy testified that he had blackouts once a month since 2007, but he told Dr. Kozma in 2014 that the blackouts stopped in 2007 when he stopped work. The ALJ noted that Bandy said he had 100 surgeries since 2000 and 50 surgeries since 2012. Neither was correct. Bandy had four surgeries since his alleged onset date. The ALJ noted Dr. Kozma's observation that Bandy said his pain was 10 out of 10 at the consultative examination, but his body language and facial expressions were not consistent with this claimed level of pain. The ALJ noted that Bandy's claim of extreme constant pain was not consistent with the fact that he did not seek any treatment of any kind for his pain for over a year from February 2015 to March 2016. The ALJ also noted that in September 2013, after completing physical therapy, Bandy reported that he could not recall any activity that he was not able to do. The ALJ further noted that in February 2015, Bandy reported that he did not need physical therapy after his knee surgery and his range of motion was noted to be full. The ALJ also noted that in August 2016, Bandy reported after getting a Medrol Dospak steroid treatment in his shoulder that he was able to do everything he needed to do. The ALJ found that all of this evidence was inconsistent with Bandy's claims of constant debilitating pain. The ALJ found that Bandy's testimony that he

had a two to five-pound lifting restriction was inconsistent with the medical records. No record showed that any medical treating source imposed a lifting restriction on Bandy. The ALJ also noted that Bandy usually only took over-the-counter pain medication. The ALJ also found that Bandy and William Bandy's reports of Bandy's daily activities was inconsistent with his statements of totally disabling pain. In light of these inconsistencies, the ALJ did not give weight to Bandy's statements that were inconsistent with the other evidence in the record. The ALJ found that the other evidence in the record supported the RFC finding. R. 17-21.

After determining Bandy's RFC, the ALJ found at Step 4 that Bandy could, for purposes of the DIB determination, perform his prior duck station work that was equivalent to a creel clerk. The ALJ referred to this job as creel clerk. Bandy performed the creel clerk job from September 2001 to March 2002. A claimant's prior work is relevant if performed within the last 15 years. The ALJ determined that the creel clerk job was relevant for DIB because Bandy performed the work within Bandy's Last Date Insured, December 31, 2012. The ALJ relied on vocational expert Shaworker to make this finding. R. 21.

The ALJ found that Bandy's creel clerk job was not relevant for Bandy's SSI application because the relevant period to determine disability

is any time from the application date up to the date of the ALJ's decision. Bandy performed the creel clerk job more than 15 years before the date of the ALJ's decision. Thus, for purposes of SSI at Step 4, Bandy had no relevant past work that he could perform. R. 22.

At Step 5, the ALJ determined that Bandy could perform a significant numbers of jobs in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 and the testimony of vocational expert Shaworker that a person with Bandy's age, education, work experience, and RFC could perform the representative jobs of information clerk, toll collector, and document preparer. The ALJ concluded that Bandy was not disabled. R. 23.

Bandy appealed the ALJ's decision. On March 9, 2018, the Appeals Council denied Bandy's request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 1. Bandy then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence. Bandy does not challenge the ALJ's decisions at Steps 1-3. The RFC decision at Step 4 was supported by the opinion evidence of PA Smith and Drs. Gonzalez and Gotanco; Bandy's statements in the medical records in September 2013, February 2015, and August 2016 to the effect that he

was not limited in performing physical activities that he wanted to perform; Bandy's testimony at the hearing that he could do what he wanted prior to the shoulder replacement surgery; Dr. Rogalsky's February 10, 2017 notes that showed that the shoulder replacement surgery was successful and Bandy's shoulder replacement would respond well to physical therapy; and Bandy's statement on February 13, 2017, that he stopped taking prescription pain medication two weeks after the surgery. All this evidence supported the ALJ's finding that Bandy could perform a limited range of light work, both on or before December 31, 2012 for purposes of his DIB application, and after he fully recovered from his shoulder replacement surgery for purposes of his SSI application.

The ALJ's finding at Step 4 that Bandy could do his prior creel clerk job for purpose of his DIB application was supported by the RFC determination and the testimony of vocational expert Shaworker. The ALJ's finding at Step 5 that he could perform a significant number of jobs in the national economy was supported by the RFC determination, the Medical-Vocational Guidelines, and the testimony of vocational expert Shaworker. The ALJ's decision was supported by substantial evidence.

Bandy argues that the RFC was not supported by medical evidence. The Court disagrees. The opinions of Drs. Gotanco and Gonzalez

supported the RFC determination.  The opinion of PA Smith supported the finding for Bandy's RFC as of December 31, 2012.  Bandy's statements that he had no limitations from September 2013 to approximately January 2014 when he picked up a piece of firewood supported the finding. Bandy's statements to his doctors and physical therapists in September 2013, February 2015, and August 2016 to the effect that he could perform all desired activities supported the finding.  Dr. Rogalsky's determination that the shoulder replacement surgery was successful and Bandy's shoulder replacement would respond well to physical therapy also supported the RFC finding.  All this evidence supported the conclusion that Bandy could perform a limited range of light work.  The ALJ also gave some consideration to Bandy's testimony and restricted the range of work more than the opinions of PA Smith and Drs. Gonzalez and Gotanco by limiting Bandy to lift overhead no more than frequently.  See R. 20.  The Court finds that the RFC finding was amply supported by substantial evidence in the record.

Bandy argues that the ALJ failed to mention Bandy's report to his physical therapist on February 27, 2017 that he had swelling in his left hand and wrist throughout the day, and that he felt tight in his shoulder area. The Court finds no error.  The ALJ is not required to cite to every single

piece of evidence.  See Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009).

The February 27, 2017 physical therapy session was only the second week

of a planned 10-week course of physical therapy.  See R. 636.  On

February 10, 2017, Dr. Rogalsky said that Bandy's shoulder replacement

would respond well to physical therapy.  Given Dr. Rogalsky's assessment,

the ALJ did not err in deciding not to mention Bandy's reports of problems

in the second week of a planned 10-week course of therapy.

Bandy complains that the opinions of Drs. Gonzalez and Gotanco

were too old and did not consider Bandy's subsequent surgeries.  The ALJ

considered the age of the opinions in the weight she gave to them.  R. 20.

The ALJ also considered evidence from after the dates of their opinions

which supported the conclusion that the opinions were consistent with the

later medical evidence, including Bandy's statements to his doctors in

February 2015 and August 2016 that showed that Bandy responded well to

his surgeries and had significant use of his arms and legs.   The evidence

provided substantial evidence that the prior opinion evidence from Drs.

Gonzalez and Gotanco remained relevant.  There was no error.

Bandy argues that the ALJ erred in evaluating Bandy's credibility.

The ALJ did not make a credibility finding because the Commissioner has

instructed ALJ's not to do so.  See SSR 16-3p, 2016 WL 1119029, at *1

(2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  Rather, the ALJ properly evaluated Bandy's statements regarding the intensity, persistence, and limiting effect of symptoms in light of the evidence as a whole:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p, 2016 WL 1119029, at *7.  In performing this analysis, the ALJ found that Bandy's statements were inconsistent with the evidence in the record at several points as detailed above.  In light of these numerous inconsistencies, the Court finds no error in the ALJ's determination that Bandy's symptoms were less likely to reduce his residual functional capacity.

Bandy argues that the ALJ improperly considered Bandy's reports of daily activities to be equivalent to activities at a full-time job.  The Court again disagrees.  The ALJ considered Bandy's daily activities in light of all

the evidence in the record.  She did not consider his daily activities as equivalent to the activities required in a full-time job.

Bandy argues that the ALJ erred in stating that Bandy only took over-the-counter medications.  Bandy is incorrect.  The ALJ did not find that Bandy only took over-the-counter medication. *(emphasis added)*  The ALJ noted that Bandy "usually took only over-the-counter medication." *(emphasis added)*  R. 20.  Ample evidence in the record supports that statement.  Bandy repeatedly reported to his health care professionals that he avoided taking prescription pain medication.  He regularly reported that he took over-the-counter ibuprofen instead.  See 315, 580, 648, 686, 689.  There was no error.

Bandy complains that the ALJ relied on the fact that Bandy did not seek treatment from February 2015 to March 2016 as inconsistent with his claims of constant debilitating pain.  The Court sees no material error.  Bandy saw doctors frequently when he had a problem.  In 2012, he did not follow Dr. Bilko's recommendation to go to Washington University School of Medicine because he did not want to go to St. Louis.  Rather, he asked to see Dr. Rogalsky again.  The ALJ could conclude from the record that Bandy generally sought out medical care when he had a problem.  Furthermore, Bandy testified that he had "standard" medical insurance.  R.

50; see also R. 38. This testimony constitutes substantial evidence to support the conclusion that Bandy had the financial ability to pay for care. This testimony and the record of Bandy's practice to seek medical care provides substantial evidence to support the significance that the ALJ attributed to the fact that Bandy did not seek treatment for over a year from February 2015 to March 2016.

Bandy's remaining arguments are also not persuasive. The decision of the ALJ was supported by substantial evidence.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 19) is ALLOWED, and Plaintiff Michael Craig Bandy's Motion for Summary Reversal (d/e 15) is DENIED. The decision of the Defendant Commissioner is AFFIRMED. All pending motions are denied as moot. THIS CASE IS CLOSED.

ENTER: February 14, 2020

_s/ Tom Schanzle-Haskins_

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE